# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

PROUD VETERANS, LLC,

      Plaintiff,

v.

ARI BEN-MENASHE, et al.,

      Defendants.

Case No. 12-CV-1126-JAR

## MEMORANDUM AND ORDER

Plaintiff Proud Veterans, LLC's Complaint in this diversity case alleges conspiracy to defraud, breach of contract, breach of fiduciary duty, and seeks to pierce the corporate veil.[1] Defendants filed motions to dismiss, alleging a lack of personal jurisdiction, improper venue and failure to state a claim. Plaintiff filed a Motion for an Order Providing for Jurisdictional Discovery.[2] The Court granted Plaintiff's motion, and ordered jurisdictional discovery on the limited issue of personal jurisdiction and venue.[3] Limited jurisdictional discovery has been completed. Before the Court is Defendants' renewed Motion to Dismiss (Doc. 30). The matter has been fully briefed and the Court is prepared to rule. For the reasons set forth in detail below, the Court finds that Defendants' Motion to Dismiss should be granted for lack of personal

---

[1]Doc. 1.

[2]Doc. 22.

[3]Doc. 26.

1

jurisdiction, but the Court allows the parties additional time to brief the issue of transfer.

## I.     Factual Background

Drawing all reasonable inferences in favor of Plaintiff, the following facts are taken from the Complaint and attached exhibits, and the declarations and exhibits attached to the parties' briefs.  The Court does not consider any general or conclusory allegations unsupported by affidavit or other evidence.

This case arises out of a failed transaction between Defendant Traeger Resources and Logistics, Inc. ("Traeger"), the seller of soybeans and Global Energy Markets ("GEM"), the buyer, who is not a party to this action.  Plaintiff Proud Veterans characterizes the transaction as an "advance fee scheme." Defendants claim, however, that the transaction failed because GEM's letter of credit ultimately proved to be insufficient to fund its purchase of the soybeans.

In January 2011, Plaintiff Proud Veterans, LLC ("Plaintiff") entered into a contract with GEM to promote GEM's grain sales to Iran.  To that end, in Montreal, Canada in February 2011, Plaintiff introduced GEM to Traeger, a grain supplier.  Negotiations between GEM and Traeger commenced, with Plaintiff acting as facilitator,  in exchange for Plaintiff earning a commission of six dollars per metric ton.  Defendant Ari Ben-Menashe ("Ben-Menashe"), a principal of Traeger, negotiated the contract on behalf of Traeger; while Fred Boldaji and Sina Soumekhian negotiated for GEM.  Nick Gnemi, owner and CEO of Plaintiff, negotiated on behalf of Plaintiff.

The negotiations were successful and in April 2011, in a meeting in Amman, Jordan, Traeger and GEM entered into a contract for Traeger to sell 35,000 metric tons of soybeans to GEM.   The contract required that GEM have a bank letter of credit in an amount equal to the

sale price plus the shipping costs.   Shortly thereafter, GEM and Traeger agreed to amend the contract to provide that Traeger would provide all shipping arrangements at a price of $30 per metric ton, from which $10 per metric ton would be paid by Defendant Dickens & Madson ("Dickens").   Traeger urged and recommended to GEM that Dickens be a participant in this transaction, because Dickens would contribute $10 per metric ton from its source.   Ben-Menashe further stated that Dickens' "source" was the United States government, because Leon Panetta, then Director of the CIA and a personal friend of Ben-Menashe had convinced the United States to assist this transaction with money in the from of a contribution to the purchase price.   The amended contract also required an advance deposit of $700,000 for shipping from GEM or GEM's sources.

When GEM and some potential investors from Dubai were unwilling or unable to deposit any advance money, Traeger pressed Plaintiff to make the deposit or find investors who would. Ben-Menashe, on behalf of Traeger, assured GEM that Traeger would send documentation reflecting that the advance money would be held in escrow and returned if not used to transport the soybeans.   Thereafter, from April 4 to May 5, 2011, Plaintiff made a series of four payments towards the $700,000 advance deposit, wiring a total of $450,000 to Defendant William Schaap's attorney trust fund account at HSBC Bank New York City.   Schaap is an attorney who represented Defendants Traeger, Dickens and Ben-Menashe.

After the first wire from Plaintiff, GEM emailed Schaap clarifying GEM's  request for documentation of the agreement that the funds would be held in escrow.   That same day, Schaap sent a letter in response to GEM, which falsely stated that the $700,000 would be used for shipping costs or would be refunded.   The Complaint alleges that Ben-Manashe and Schaap

knew that the Plaintiff believed that under the uniform custom and practice of the trade, the advance money for shipping costs would be refunded after a reasonable time if the funds were not in fact used for shipping costs. On the same day as Schaap's letter to GEM, in a telephone conversation, Ben-Menashe falsely told Gnemi of Proud Veterans that Traeger owned sufficient soybeans to complete the contract and that the soybeans would be delivered in less than thirty days. Four days later, Ben-Menashe called Gnemi seeking additional funds for shipping and Plaintiff introduced investor Allen Nasserisafar as an additional depositor of advance funds.

After Plaintiff transmitted two of the four wire payments to Schaap's attorney trust fund account, Defendant Ovsjannikovs, a principal of Andre Maritime Services Company ("Andre Maritime"), falsely told Gnemi and Nasserisafar that the soybeans were located in the free port of Alexandria, Egypt. Two days later, on April 29, 2011, Ben-Menashe falsely stated that the soybeans were in storage in Alexandria and ready for delivery.

Plaintiff engaged an Iranian bank representative to investigate whether the soybeans were in fact in storage and ready for delivery, and Plaintiff emailed Traeger on May 1, 2011 to inform Traeger of Plaintiff's investigation. When Plaintiff's representative could not find the soybeans in any of the storage facilities in Alexandria that could accommodate that quantity of soybeans, Gnemi and Boldaji of GEM called Ovsjannikovs and confronted him with this discovery. Ovsjannikovs did not dispute the report and stated he would report it to Ben-Menashe.

On May 10, 2011 Ben-Menashe sent another addendum to the Traeger-GEM contract that confirmed the $700,000 deposit had been made and further stated that Traeger would make the first shipment of the soybeans effective May 10, 2011. The addendum further provided that GEM would provide Traeger with a copy of a revised letter of credit "Paid at Site," within 72

hours after receipt of the validated request for shipping company, shipping agreement, name of ship and proposed date and location for loading the ship. On May 10, Ovsjannikovs, on behalf of Andre Maritime, sent a letter to GEM stating that Andre was ready to charter the ships to deliver the soybeans. GEM and the other depositors waited, but never received any information about the shipping agreement or other shipping arrangements and thus GEM never obtained a revised letter of credit.

Thereafter, Traeger never produced any documentation showing the existence of soybeans to fulfill the contract, and on May 18, Ben-Menashe stated that the soybeans had been sold to a different buyer because of GEM's non-performance of the contract. But, on May 20, Ben-Menashe stated that the Traeger-GEM contract was still in effect and that GEM's letter of credit was sufficient. Ben-Menashe also falsely stated that Traeger would proceed to fulfill the contract by obtaining soybeans from another supplier. Thereafter, Plaintiff requested documentation about shipping and documentation confirming the location where the advance money was on deposit. Ben-Menashe responded that he was going to cancel "this deal," because GEM was not in compliance; but on May 31, 2011 Ben-Menashe falsely stated that he had a new Iranian buyer for the soybeans and that the Traeger-GEM contract was still in effect and would be performed as originally agreed.

GEM's letter of credit expired on or about June 6, 2011, and Plaintiff requested reimbursement of the advance funds deposited in Schaap's trust fund account. Ben-Menashe and Ovsjannikovs continued to assure Plaintiff and GEM that the contract would be executed soon, and Schaap emailed them, falsely stating that the contract would be completed within two weeks. On August 19, 2011, Traeger failed to meet another deadline, and GEM and

Traeger entered into a second contract called a "Reaffirmation Agreement" that reaffirmed their obligations under the original contact and agreed that Traeger owed Plaintiff $1,050,000 and owed GEM $3,150,000.   On or about August 22, 2011, Schaap falsely told GEM's attorney that the funds were in a Traeger bank account in Hong Kong and would be wired to Schaap's attorney trust fund account for distribution to GEM and Plaintiff "in a day or two."  On September 2 and again on September 4 and 5, 2011, Ben-Menashe falsely stated that the funds had been "held up" by the government of China, but would be released and received in New York and then transferred to GEM and Plaintiff "in a day or two."  On September 6, 2011, pursuant to the Reaffirmation Agreement, Traeger wired $87,000 from Schapp's HSBC bank account in New York to Plaintiff's Intrust Bank account in Kansas.

Thereafter, Plaintiff made repeated demands for payment of the remainder of the advance funds.  Plaintiff and GEM entered into a new settlement agreement with Traeger.[4]  The settlement agreement was intended to resolve all claims arising out of the prior contracts and/or obligations and is expressly governed by New York law.  Ben-Menashe falsely stated to GEM that sufficient funds to pay the amounts due under the settlement agreement were on deposit in a Traeger bank account in Hong Kong, but that the Chinese government and Chinese banking authorities were preventing Traeger's withdrawal of the funds so it could pay the balance due under the settlement agreement.  Plaintiff claims that Schaap transferred the trust funds to Traeger, which were then transferred to other persons or entities intended to be beyond the reach of Traeger's creditors.

Plaintiff is a Kansas limited liability company.  Defendant Traeger is incorporated in

---

[4]Doc. 1 at ¶¶ 51, 53, and Doc. 1–1 (Ex. O).

New York and has offices in Montreal, Quebec, Canada. Defendant Ben-Menashe is a citizen of Canada and resides in Montreal. Defendant Schaap is a citizen of the state of New York. Defendant Dickens & Madson is incorporated in New York and has offices in Montreal. Defendant Ovsjannikovs is a citizen of Canada and lives in Montreal. Defendant Andre Maritime is a Latvian company doing business in Latvia and Montreal. GEM is not a party to this action, and is a company doing business in Virginia.

Plaintiff's Complaint alleges diversity jurisdiction under 28 U.S.C. § 1332, proper venue under 28 U.S.C. § 1391(a)(2), and sets forth the following causes of action: conspiracy to defraud as to all Defendants (Count I); breach of a settlement agreement as to Defendants Traeger and Ben-Menashe (Count II); breach of fiduciary duty as to Defendants Ben-Menashe and Schaap (Count III);[5] piercing the corporate veil and holding Defendant Ben-Menashe personally liable for Traeger's acts (Count IV); and attorney fees and costs as punitive damages against Defendants Traeger, Ben-Menashe and Schaap (Count V).

All Defendants[6] seek dismissal on the grounds that the Court lacks personal jurisdiction and that venue in Kansas is improper. In addition, Defendants Ben-Menashe and Schaap move for dismissal of the breach of fiduciary duty claim for failure to state a claim.[7]

## II.    Standards for Personal Jurisdiction under Rule 12(b)(2).

---

[5]The Court notes that Count III states that it applies only to Defendants Ben-Manashe and Schaap, while the prayer in the Complaint seeks judgment on Count III against Traeger, Ben-Menashe and Schaap. Doc. 1 at 25–26, 29.

[6]The Court notes that although the Motion to Dismiss does not list Defendant Andre Maritime Agency Co. as a movant, the memorandum in support makes it clear that the motion is on behalf of all Defendants. *See* Doc. 31 at 6, 19.

[7]Doc. 31 at 3–4.

Plaintiff has the burden of establishing personal jurisdiction over Defendants.[8]  In the absence of an evidentiary hearing, as in this case, the plaintiff must make only a prima facie showing of jurisdiction to defeat a motion to dismiss.[9]  "The plaintiff may make this prima facie showing by demonstrating, via affidavit or other written materials, facts that if true would support jurisdiction over the defendant."[10]  Allegations in a complaint are accepted as true if they are plausible, non-conclusory, and non-speculative, to the extent that they are not controverted by submitted affidavits.[11]  At the same time, the Court does not have to accept as true conclusory allegations, nor incompetent evidence.  When a defendant has produced evidence to support a challenge to personal jurisdiction, a plaintiff has a duty to come forward with competent proof in support of the jurisdictional allegations of the complaint.[12]  The court resolves all factual disputes in favor of the plaintiff.[13]  Conflicting affidavits are also resolved in the plaintiff's favor, and "the plaintiff's prima facie showing is sufficient notwithstanding the contrary presentation by the moving party."[14]  "In order to defeat a plaintiff's prima facie showing of jurisdiction, a defendant must present a compelling case demonstrating 'that the presence of some other

---

[8]*Shrader v. Biddinger*, 633 F.3d 1235, 1239 (10th Cir. 2011).

[9]*AST Sports Sci., Inc. v. CLF Distrib. Ltd.,* 514 F.3d 1054, 1056–57 (10th Cir. 2008); *Wenz v. Memery Crystal*, 55 F.3d 1503, 1505 (10th Cir. 1995).

[10]*Emp'rs Mut. Cas. Co. v. Bartile Roofs, Inc.*, 618 F.3d 1153, 1159 (10th Cir. 2010) (citing *TH Agric. & Nutrition, LLC v. Ace European Grp. Ltd.,* 488 F.3d 1282, 1286 (10th Cir. 2007)); *OMI Holdings, Inc. v. Royal Ins. Co. of Can.*, 149 F.3d 1086, 1091 (10th Cir. 1998).

[11]*Dudnikov v. Chalk & Vermilion Fine Arts, Inc.*, 514 F.3d 1063, 1070 (10th Cir. 2008) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)); *Pytlik v. Prof'l Res., Ltd.*, 887 F.2d 1371, 1376 (10th Cir. 1989); *Behagen v. Amateur Basketball Ass'n of U.S.A.*, 744 F.2d 731, 733 (10th Cir. 1984), *cert. denied*, 471 U.S. 1010 (1985).

[12]*Pytlik*, 887 F.2d at 1376.

[13]*Dudnikov*, 514 F.3d at 1070.

[14]*Behagen*, 744 F.2d at 733.

considerations would render jurisdiction unreasonable.'"[15]

## III. Minimum Contacts

In a federal diversity case, the law of the forum state determines the court's jurisdiction over defendants.[16] To establish personal jurisdiction over a defendant, plaintiff must show that jurisdiction is proper under the laws of the forum state and that the exercise of jurisdiction would not offend due process.[17] The Kansas long-arm statute is construed liberally so as to allow jurisdiction to the full extent permitted by due process, therefore the Court proceeds directly to the constitutional analysis.[18]

The due process analysis is comprised of two steps. First, the court must consider whether the defendant has such minimum contacts with the forum state "that he should reasonably anticipate being haled into court there."[19] If the requisite minimum contacts are found, the Court will proceed to the second step in the due process analysis—ensuring that the exercise of jurisdiction "does not offend 'traditional notions of fair play and substantial justice.'"[20]

"Minimum contacts" can be established in one of two ways, either generally or specifically for lawsuits based on the forum-related activities:

---

[15]*OMI Holdings*, 149 F.3d at 1091 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477 (1985)).

[16]Fed. R. Civ. P. 4(e); *Marcus Food Co. v. DiPanfilo*, 671 F.3d 1159, 1166 (10th Cir. 2011).

[17]*Intercon, Inc., v. Bell Atl. Internet Solutions, Inc.*, 205 F.3d 1244, 1247 (10th Cir. 2000).

[18]*Federated Rural Elec. Ins. Corp. v. Kootenai Elec. Coop.*, 17 F.3d 1302, 1305 (10th Cir. 1994) (citing *Volt Delta Res., Inc. v. Devine*, 740 P.2d 1089, 1092 (Kan. 1987)).

[19]*Emp'rs Mut. Cas. Co.*, 618 F.3d at 1159–60 (citing *OMI Holdings, Inc.*, 149 F.3d at 1091).

[20]*See World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 292 (1980) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).

> General jurisdiction is based on an out-of-state defendant's
> "continuous and systematic" contacts with the forum state, and
> does not require that the claim be related to those contacts.
> Specific jurisdiction, on the other hand, is premised on something
> of a *quid pro quo*: in exchange for "benefitting" from some
> purposive conduct directed at the forum state, a party is deemed to
> consent to the exercise of jurisdiction for claims related to those
> contacts.[21]

Plaintiff does not allege general jurisdiction, but alleges that Defendants had minimum contacts with Kansas based on specific jurisdiction.[22]  Specific jurisdiction exists over a nonresident defendant "if the defendant has 'purposefully directed' his activities at residents of the forum, and the litigation results from alleged injuries that 'arise out of or relate to' those activities."[23]  In evaluating the "purposefully directed" element, the Tenth Circuit has explained:

> The first element can appear in different guises.  In the tort
> context, we often ask whether the nonresident defendant
> "purposefully directed" its activities at the forum state; in contract
> cases, meanwhile, we sometimes ask whether the defendant
> "purposefully availed" itself of the privilege of conducting
> activities or consummating a transaction in the forum state.  In all
> events, the shared aim of "purposeful direction" doctrine has been
> said by the Supreme Court to ensure that an out-of-state defendant
> is not bound to appear to account for merely "random, fortuitous,
> or attenuated contacts" with the forum state.[24]

Because Plaintiff alleges both tort and contract causes of action, the Court will look to case law

---

[21]*Dudnikov*, 514 F.3d at 1078 (internal citations and quotations omitted).

[22]Plaintiff claims that the Kansas long-arm statute specifically provides for jurisdiction of its tort and contract claims in this case.  *See* K.S.A. § 60-308(b)(1)(A), (B) and (E).  The Court "need not conduct a statutory analysis apart from the due process analysis."  *Marcus Food Co. v. DiPanfilo*, 671 F.3d 1159, 1166 (10th Cir. 2011) (citation and quotation omitted); *Volt Delta Res., Inc. v. Devine*, 740 P.2d 1089, 1093 (Kan. 1987) ("Although the requirements of the long arm statute may be satisfied, federal constitutional considerations may defeat the assertion of personal jurisdiction.").

[23]*OMI Holdings*, 149 F.3d at 1091 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985)).

[24]*Dudnikov*, 514 F.3d at 1071 (internal citations omitted).

interpreting both the "purposefully directed" and "purposefully availed" requirements.[25]

### a.    Purposeful Direction

To satisfy the "purposeful direction" requirement, Plaintiff cites cases holding that personal jurisdiction may be granted under the Kansas long-arm statute when the effects of a tortious act by a foreign defendant are felt by the plaintiff in Kansas. However, in the Tenth Circuit, "[t]he mere allegation that an out-of-state defendant has . . . committed business torts that have allegedly injured a forum resident does not necessarily establish that the defendant possesses the constitutionally required minimum contacts."[26] The Court evaluates both the quantity and quality of defendant's contacts with the State of Kansas.[27] The Tenth Circuit, as well as other courts, requires a plaintiff to present "something more" than the injuries a plaintiff allegedly suffered in order to show that a defendant aimed or targeted its conduct at the forum state.[28]

The Tenth Circuit applies an "effects test," allowing the exercise of jurisdiction when there is a prima facie showing that defendant (1) intentionally acted (2) in a manner expressly

---

[25]The Court finds that the "arising out of or relating to" requirement is met in this case. Plaintiff alleges that Defendants breached their contract with Plaintiff and conspired to defraud Plaintiff pursuant to an advance fee scheme that included lulling the victim into inaction by false promises that the Defendants would soon be fulfilling their end of the bargain. All of Defendants' contacts relate to the merits of Plaintiff's claims.

[26]*Far W. Capital, Inc. v. Towne*, 46 F.3d 1071, 1079 (10th Cir. 1995); *see also, Tomlinson v. H & R Block, Inc.*, 151 F. App'x 655, 658 (10th Cir. 2005) ("But the mere allegation that a nonresident defendant tortiously injured a forum resident does not necessarily establish sufficient minimum contacts to confer personal jurisdiction on the forum.").

[27]*Pro Axess, Inc. v. Orlux Distrib., Inc.*, 428 F.3d 1270, 1278 n.5 (10th Cir. 2005); *OMI Holdings*, 149 F.3d at 1092.

[28]*See, e.g., Dudnikov*, 514 F.3d at 1077; *Allison v. Wise*, 621 F. Supp. 2d 1114, 1120 (D. Colo. 2007); *Sunlight Saunas, Inc. v. Sundance Sauna, Inc.*, 427 F. Supp. 2d 1011, 1021 (D. Kan. 2006) (citing *Cybersell, Inc. v. Cybersell, Inc.*, 130 F.3d 414, 418 (9th Cir. 1997)); *Gage, Inc. v. BioConversion Tech., LLC*, No. 2:08-CV-57 DB, 2009 WL 3181940, at *10 (D. Utah Sept. 30, 2009); *Toytrackerz LLC v. Koehler*, No. 08-2297-GLR, 2009 WL 1505705, at *13, *16 (D. Kan. May 28, 2009).

aimed at Kansas, with (3) knowledge that the brunt of the injury would be felt in Kansas.[29]

While there is some overlap between the two elements, "expressly aiming" conduct is not the

same as an awareness of its foreseeable consequences. "[T]he 'express aiming' test focuses

more on a defendant's intentions—where was the 'focal point' of its purposive efforts—while

the latter requirement concentrates on the consequences of the defendant's actions—where was

the alleged harm actually felt by the plaintiff."[30] To "expressly aim" conduct, the forum state

must be the "focal point of the tort."[31] Plaintiff has failed to make this showing, instead relying

entirely on the awareness of foreseeable consequences; in this case, the fact that Plaintiff is

located in Kansas.[32] "[T]he plaintiff's residence in the forum, and suffering of harm there, will

not alone support jurisdiction under *Calder*."[33] A plaintiff's principal place of business has been

characterized as a "mere fortuity."[34] In this case, the Court cannot find that Kansas was the focal

point of the tort.

---

[29] *Dudnikov*, 514 F.3d at 1072 (analyzing *Calder v. Jones*, 465 U.S. 783 (1984)).

[30] *Id*. at 1075.

[31] *Id.* at 1074 n.9 (quoting *Far West*, 46 F.3d at 1080).

[32] *See Far West*, 46 F.3d at 1080 ("Although FWC argues that it suffered the financial effects of these alleged torts in Utah where it is incorporated, we hold that under *Calder* and its progeny, the defendants' contacts with Utah are insufficient to establish personal jurisdiction in this case."); *Wenz v. Memery Crystal*, 55 F.3d 1503, 1508 (10th Cir.1995) ("That Wenz may be economically impacted in Colorado, simply because he lives there, is insufficient to establish personal jurisdiction under subsection (1)(b) of the Colorado long-arm statute").

[33] *Shrader v. Al Biddinger*, 633 F.3d 1235, 1244 (10th Cir. 2011) (citations and quotations omitted); *see also Grynberg v. Ivanhoe Energy, Inc.*, 490 F. App'x 86, 2012 WL 2855777, at *8 (10th Cir. 2012) (finding that although plaintiffs identified conduct that is connected in an attenuated fashion to Colorado, they fail to establish that Colorado was the focal point of the defendants' torts.).

[34] *Far West*, 46 F.3d at 1079 (citing *Reynolds v. Int'l Amateur Athletic Fed'n*, 23 F.3d 1110 (6th Cir.), *cert. denied*, 513 U.S. 962 (1994); *Southmark Corp. v. Life Investors, Inc.*, 851 F.2d 763, 773 (5th Cir. 1988)).

### b.     Purposeful Availment

The purposeful availment/expressly aimed requirement "ensures that a defendant will not be haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts."[35] The Complaint alleges that Ben-Menashe and Schaap, on behalf of Traeger, negotiated two settlement contracts with Plaintiff, one in August 2011,[36] and the other September 28, 2011,[37] which replaced the August contract. The mere existence of a contract with a Kansas citizen is insufficient to establish the requisite minimum contacts in the forum state.[38] Although agreements alone are not sufficient to establish minimum contacts, "'parties who reach out beyond one state and create continuing relationships and obligations with citizens of another state are subject to regulations and sanctions in the other state for the consequences of their activities."[39] The Court must examine the parties' "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing."[40]

The parties' agreements in this case did not create a continuing relationship, nor did Defendants initiate or solicit Plaintiff's involvement. Plaintiff was initially introduced to Defendants in connection with possible corn and wheat transactions. Those transactions were

---

[35]*Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985) (internal citations and quotation marks omitted).

[36]Doc. 1-1 at 29–30 (Ex. M).

[37]Doc. 1-1 at 32–34 (Ex. O).

[38]*See Burger King Corp.*, 471 U.S. at 478; *TH Agric. & Nutrition, LLC v. Ace European Grp. Ltd.*, 488 F.3d 1287 (10th Cir. 2007).

[39]*Marcus Food Co.*, 671 F.3d at 1166 (citations omitted).

[40]*Id.* at 1166–67.

cancelled and are not the subject of this lawsuit.[41]  In February 2011, Gnemi was contacted by

GEM, who was interested in supplying corn, soybeans and wheat to Iran.[42]  Gnemi declares that

he set up a meeting for GEM's principals to meet him in Montreal, Canada so that Gnemi could

introduce them to Ben-Menashe and Ovsjannikovs.[43]  Gnemi contacted Ben-Menashe and asked

if Traeger could provide 70,000 metric tons of soybeans to GEM as Plaintiff's customer.[44]

Because Traeger was quoting the best price at the time, Gnemi encouraged GEM to do business

with Traeger.[45]  In March 2011, Gnemi contacted Traeger again about another corn transaction,

which contract offer was ultimately withdrawn by Ben-Menashe because his priority was going

to supplying soybeans to GEM instead of supplying corn to South Korea.[46]  Courts consider a

defendant's solicitation as a significant factor in determining minimum contacts with the state of

Kansas,[47] but here the solicitation was initiated by Plaintiff, who did not ultimately contract with

Traeger; GEM did.

 In this case, the original soybean transaction contemplated a one-time sale.  The two

---

[41]Gnemi's Declaration states that in the fall of 2010, Proud Veterans was looking for a corn seller, and corresponded with Lenni Lenig of Aid Interactive, a New York company, who introduced Gnemi to Traeger, which purported to be a seller of corn.  Gnemi spoke to Ben-Menashe via telephone and then made arrangements to meet him and his staff in Montreal, Canada.  After that meeting, the parties attempted corn and wheat transactions that were cancelled and are not the subject of this lawsuit.  Doc. 37-1 at ¶9.

[42]Doc. 37-1 at ¶21.

[43]*Id.*

[44]*Id.* at ¶22.

[45]*Id.*

[46]*Id.* at ¶23.

[47]*See, e.g., Cargill Meat Solutions Corp. v. Premium Beef Feeders, LLC*, No. 13-CV-1168-EFM, 2014 WL 172197, at *3 (D. Kan. Jan. 15, 2014) (noting that defendants sought plaintiff's business and continued their contractual relationship well over a year); *Hutton & Hutton Law Firm, LLC, v. Girardi & Keese*, No. 13-1115-RDR, 2014 WL 36313, at *7 (D. Kan. Jan. 6, 2014) (finding that where contact was unsolicited by plaintiff, defendant's solicitation of plaintiff firm was significant factor in determining minimum contacts.).

settlement agreements were an attempt to resolve the disputes arising from the failed soybean transaction. This situation is distinguishable from cases finding personal jurisdiction where the parties' agreements envisioned an on-going relationship.[48] In contrast, the settlement agreement was designed to amicably end the relationship.

Plaintiff argues that these contracts each required Plaintiff to perform its obligations under the contract in Kansas. Plaintiff claims that the contracts were sent to Kansas, executed by Plaintiff in Kansas, and required partial performance by Plaintiff in Kansas by executing and having notarized and delivered into escrow general releases—all of which Plaintiff did. Plaintiff claims that this shows that Ben-Menashe and Traeger "purposefully availed" themselves of the opportunity to do business in Kansas and to enter into a contract that was to be performed by Plaintiff in Kansas. While Plaintiff was required to execute releases and to deliver them into escrow in Maryland, the contract did not require this to be done in Kansas nor was the attorney holding the documents in escrow located in Kansas.[49] Plaintiff's decision to execute the documents in Kansas was a personal preference, not a contract requirement. This conduct by Plaintiff is the type of random, fortuitous, or attenuated contact that is insufficient to show Defendants' purposeful availment.

The court must examine both the quantity and quality of defendants' contacts with the

---

[48]*See, e.g., Marcus*, 671 F.3d at 1167–68 (finding a continuing relationship where the parties conducted a 10-year agency relationship).

[49]*See Payless Shoesource, Inc. v. Shops at Hancock, LLC*, No. 11-4144-KHV, 2012 WL 1344977, at *4 (D. Kan. April 18, 2012) (noting that where lease provisions in that case and a companion case designated a Kansas address for notices and payments, but allowed plaintiff to change that designation, location in Kansas was not relevant to the lease performance.); *see also Green Country Crude, Inc. v. Avant Petroleum, Inc.*, 648 F. Supp. 1443, 1449 (D. Kan. 1986) (noting that "performance of a contract" within the meaning of the Kansas long-arm statute is the timely execution of the acts required by the agreement, at the location and in the manner stipulated).

forum state.[50]  Defendants will not be subjected to the laws of a jurisdiction based only on random, fortuitous or attenuated contacts.[51]  Nor will the defendant be subjected to the laws of a jurisdiction solely as the result of the unilateral activity of another party or third person.[52]

In this case, Defendants' alleged contacts consist of four telephone calls from Ben-Menashe in Canada to Gnemi of Proud Veterans in Kansas;[53] one conference call from Ben-Menashe in Canada to Gnemi in Kansas and Nasserisafar in Tennessee;[54] an email from Schaap addressed to don@proudveteransllc.com, info@traegerdirect.com, nick@proudveteransllc.com and cc'd to sina@gemarkets.net;[55] and a wire transfer of $87,000 Traeger caused to be wired from Schaap's HSBC account to Proud Veterans Intrust Bank account in Kansas pursuant to the Reaffirmation Agreement.[56]  The remaining contacts with Kansas alleged by Plaintiff involved ten telephone calls, three emails, and four wire transfers by Plaintiff from its account in Kansas to Schaap's attorney trust account in New York— all initiated by Plaintiff.[57]

Schaap's declaration shows that he is an attorney licensed to practice in New York and Washington, D.C.; he represents Ben-Menashe, Traeger and Dickens; he has not been to Kansas

---

[50]*OMI Holdings*, 149 F.3d at 1092.

[51]*AST Sports Sci., Inc. v. CLF Distrib. Ltd.,* 514 F.3d 1054, 1058 (10th Cir. 2008).

[52]*Id.*

[53]Doc. 1 at ¶¶ 20, 37, 42 and 49.

[54]*Id.* at ¶21.

[55]Doc. 1-1 at 27 (Ex. L).

[56]Doc. 1 at ¶51, Doc. 1-1 at 34 (Ex. N).

[57]Doc. 1 at ¶¶17s, 22, 23, 26, 27, 28, 30, 33, 36, 38, 39, 42, 46 and 58; Doc. 1-1 at 26 (Ex. K).  The Court notes that Gnemi's Declaration states that there were several additional phone calls or emails that were not set out in the Complaint.  These additional contacts, some of which were unrelated to the transactions that are the subject of the Complaint, do not affect the Court's reasoning.

or initiated or solicited a business transaction in Kansas (other than defense of this case); he did not initiate or solicit the Plaintiff to enter into the business arrangement that is the subject matter of the Complaint; and he did not initiate any telephone calls into Kansas with respect to the matters at issue in the Complaint.[58]

Ben-Menashe likewise declared that neither Traeger nor Dickens has ever had an agent in Kansas or done business in Kansas; he has personally never been to Kansas; the business arrangement between Traeger and GEM from which the claims in this case arise was initiated in a face-to-face meeting in Amman, Jordan between himself and a representative of GEM—Plaintiff was not present and he did not understand Gnemi or any entity with which he was affiliated to be involved in the proposed transaction.[59] Ben-Menashe further declared that all of his communication with Gnemi had been either face-to-face in Montreal, Canada, where he came to do business with Traeger, or in Seoul, Korea, or by telephone or email. Further, Gnemi often initiated the calls, and when Ben-Menashe would call what he knew to be Gnemi's cell phone number, he did not know where Gnemi was physically located because he understood that he traveled extensively.[60] Ovsjannikovs declared, personally and as a representative of Andre Maritime, that he has never been to Kansas, has never solicited or initiated a business transaction in Kansas, and that he did not solicit Plaintiff to enter into the business arrangement that is the subject matter of the Complaint.[61]

---

[58]Doc. 31-1.

[59]Doc. 31-2.

[60]*Id.*

[61]Doc. 31-3.

As a general rule, letters and telephone calls are insufficient to establish personal jurisdiction.[62]  In the age of cell phones and call forwarding, calling the telephone number of someone who is in Kansas at the time is not evidence of any purposeful activity directed toward the forum state.  Gnemi's presence in Kansas at the time he answers his cell phone is fortuitous or attenuated, and the use of modern telephone contacts that are not intrinsically tied to a physical location do not necessarily constitute purposeful availment.  Telephone contacts lack constitutional significance under the minimum contacts doctrine due to the geography-defying nature of twenty-first century telephone communications.  There is no allegation either that the telephone number at which Gnemi was called or from which he called in Kansas was inherently restricted to being used or answered in Kansas (*i.e.*, that it was not a cell phone or not subject to call forwarding out-of-state) or that, if it was inherently restricted to being used or answered in Kansas, Ben-Menashe or any other Defendant knew that to be the case so that they might be held to have purposefully availed themselves of the benefits and protection of Kansas or purposefully directed their activities to Kansas.  Instead, Ben-Menashe's declaration establishes that he did not know Gnemi to be in Kansas, but rather knew him to travel extensively and called his cell phone.  The Court is aware that Gnemi declares that when he is away from Kansas he makes a practice of relaying that information to people he is dealing with by phone or email.[63]  However,

---

[62]*Far West*, 46 F.3d at 1077 ("It is well-established that phone calls and letters are not necessarily sufficient in themselves to establish minimum contacts."); *Peterson v. Kennedy*, 771 F.2d 1244, 1262 (9th Cir.1985) ("ordinarily 'use of the mails, telephone, or other international communications simply do not qualify as purposeful activity invoking the benefits and protection of the [forum] state' ") (citation omitted), cert. denied, 475 U.S. 1122 (1986); *Scullin Steel Co. v. Nat'l Ry. Utilization Corp.*, 676 F.2d 309, 314 (8th Cir.1982) ("use of interstate facilities (telephone, the mail), . . . are secondary or ancillary factors and cannot alone provide the 'minimum contacts' required by due process"); *Green Country Crude*, 648 F. Supp. at 1451 (citation omitted) ("The mere negotiation of a sales transaction, or placement of an order for goods, over the telephone with persons residing in Kansas does not invoke the benefits and protections of the laws of this state.").

[63]Doc. 37-1 at ¶8.

this would only have significance if the Defendants were aware of this practice and then only if Defendants' responsive calls or emails were sent to Plaintiff within a relatively short time-frame. There is no suggestion that any of the Defendants were aware of Gnemi's practice of informing people in phone and email correspondence if he was away from Kansas.

The same reasoning applies to the emails in this case. Defendants argue with regard to Schaap's email that: 1) the email is a reply to an email sent by Plaintiff; 2) nothing established that the email was linked to Kansas in such a way that the email was directed there; and 3) Plaintiff's letterhead identifies its location as Derby, Kansas; Sulaymaniyah, Iraq; and Gangnam-gu Seoul Korea.[64] Email communication is not targeted to a particular forum in the way a letter addressed for physical delivery is. Sending an email to be received and read at a location unknown to the sender is not an act purposefully availing oneself of the privileges and protection of Kansas law, but rather precisely the kind of "random, isolated, or fortuitous" contact with the forum that the Supreme Court has said cannot constitute a basis for jurisdiction.[65] Likewise the Plaintiff's selection of a Kansas bank as a place from which to transfer funds is not the act of a Defendant.[66] "The receipt of a wire transfer is an inherently passive action."[67] Schaap claims he transferred the funds to the Kansas bank only because that is the institution

---

[64]Doc. 1-1 at 25 (Ex. J).

[65]*Gargano v. Cayman Nat'l Corp.*, No. 09-11938-JLT, 2010 WL 2245034, at *5 (D. Mass. June 2, 2010) ("This court cannot reasonably construe an email that could have been read from any computer anywhere in the world, but which Plaintiff just happened to read in Massachusetts, as an intentional action by which Defendants availed themselves of the privileges of doing business in Massachusetts. Defendants did not direct their conduct toward Massachusetts. Rather, they sent an email to a stateless email account and Plaintiff, at his convenience, read that email from a computer located in Massachusetts.").

[66]*See Marble Pint Energy Ltd. v. Crusader Fin. Servs., Inc.*, No. 4:06CV1656 HEA, 2009 WL 1940383 at *3 (E.D. Mo. July 7, 2009) (The argument in a fraud case that personal jurisdiction arises from the plaintiff sending money from a forum-state bank "fails the due process test.").

[67]*Gargano*, 2010 WL 2245034 at *6.

selected by Plaintiff to conduct Plaintiff's banking business. The court in *Gargano v. Cayman Nat'l Corp.*, in addressing a wire transfer from the United States to the Cayman Islands, noted that "[i]t would have been equally acceptable to Defendants, if Plaintiff had transferred the necessary funds by physically walking into the Cayman National Bank and handing a teller cash or a paper check," and that therefore the defendants had not intentionally directed their conduct toward the United States, just because the money was at one time housed in an account there.[68] The court went on to state:

> To begin, the fact that Defendants knew the location of Plaintiff's domicile at the time that they dealt with him bears no relation to the allegedly fraudulent transactions, which took place entirely within the Cayman Islands. Similarly, the fact that the funds necessary to complete the transaction were *received from* the United States in no way constitutes an "important, or material element of proof in the plaintiff's case." Indeed, where the money came from is utterly irrelevant to the underlying issue, i.e. whether or not Defendants fraudulently induced Plaintiff to purchase the CLICO security. And Plaintiff's claims certainly cannot be said to have arisen out of the fax and letter sent to Plaintiff by Defendants' counsel, since they were written in response to Plaintiff's threat of litigation and, therefore, came about only after the conduct underlying Plaintiff's claims was complete.[69]

Plaintiff urges the Court to consider all of the Defendants' contacts collectively in light of the conspiracy cause of action. Although "[t]he existence of a conspiracy and [overt] acts of a co-conspirator within the forum may, in some cases, subject another co-conspirator to the forum's jurisdiction," at least one of the co-conspirators is required to have pursued the

---

[68]*Id.*

[69]*Id.* at *4.

conspiracy within the forum state.[70]  Recognizing that "parties could potentially stretch the

conspiracy cause of action to subvert the due process principles that govern personal

jurisdiction," the Tenth Circuit has acknowledged that personal jurisdiction requirements "must

be met as to each defendant."[71]  However, even assuming that this Court could consider all of the

Defendants' contacts and could find that Plaintiff has made a *prima facie* showing of minimum

contacts based on specific jurisdiction, the contacts would nevertheless be too weak to overcome

the reasonableness analysis.[72]

## IV.    Reasonableness — Would the Exercise of Personal Jurisdiction Offend Traditional Notions of Fair Play and Substantial Justice?

Assuming that Plaintiff has shown that Defendants had the requisite minimum contacts,

jurisdiction fails under the second step of the due process analysis, because subjecting

Defendants to jurisdiction in the forum state would offend traditional notions of fair play and

substantial justice.[73]  Once a plaintiff has made a minimum contacts showing, a defendant "must

present a compelling case that the presence of some other considerations would render

jurisdiction unreasonable."[74]  This requires the weighing of the following factors: (1) the burden

on defendant; (2) the forum state's interest in resolving the dispute; (3) the plaintiff's interest in

---

[70]*Newsome v. Gallacher*, 722 F.3d 1257, 1265 (10th Cir. 2013) (quoting *Melea, Ltd. v. Jawer SA*, 511 F.3d 1060, 1069 (10th Cir. 2007)).

[71]*Id.* at 1265–66 (citations and quotations omitted).

[72]*See Grynberg v. Ivanhoe Energy, Inc.*, 490 Fed. App'x. 86, 2012 WL 2855777 at *3 n.3 (10th Cir. 2012) (declining to reach the issue of whether the alleged co-conspirators' contacts may be attributed to each other, because "plaintiffs' arguments border on the conclusory and, more importantly, they have failed to show sufficient minimum contacts between *any* of the defendants and Colorado.").

[73]*See Emp'rs Mut. Cas. Co. v. Bartile Roofs, Inc.*, 618 F.3d 1153, 1161 (10th Cir. 2010).

[74]*Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477 (1985).

receiving convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the shared interest of the several states in furthering fundamental substantive social policies.[75]  Further, in this second step of the analysis, the court should consider the strength of the defendant's minimum contacts.[76]  If these factors are strong, they may serve to establish the reasonableness of jurisdiction even if plaintiff's showing of minimum contacts is weak.[77]  Conversely, "the weaker the plaintiff's showing on minimum contacts, the less a defendant need show in terms of unreasonableness to defeat jurisdiction."[78]  Given the weakness of the contacts in this case, the Defendants' burden to show unreasonableness is low.

The balance of the factors weighs in favor of Defendants.  Defendants reside in New York and Canada and have never been to Kansas.  Defendants have had no general contacts in this state, have not personally been in this state, and their only contacts with Plaintiff have been by phone and email.  Defending this action in Kansas would impose a burden on them.  However, because "defending a suit in a foreign jurisdiction is not as burdensome as in the past," especially for sophisticated parties, the Court finds that this factor weighs only slightly in favor of Defendants.[79]  The Court finds that the second factor is neutral, as Kansas as well as the non-forum jurisdictions, such as New York, have an interest in resolving disputes involving residents

---

[75]*Employers Mut. Cas. Co.*, 618 F.3d at 1161.

[76]*TH Agrig. & Nutrition, LLC v. Ace European Grp. Ltd.*, 488 F.3d 1282, 1292 (10th Cir. 2007).

[77]*OMI Holdings, Inc. v. Royal Ins. Co*, 149 F.3d 1086, 1095 (10th Cir. 1998); *Pro Axess, Inc. v. Orlux Distrib., Inc.*, 428 F.3d 1270, 1280 (10th Cir. 2005).

[78]*Trujillo v. Williams*, 465 F.3d 1210, 1221 (10th Cir. 2006) (quotations omitted).

[79]*See AST Sports Sci., Inc.*, 514 F.3d at 1061.

of their state, and the settlement agreement provides that New York law applies.[80]

Third, the Court analyzes whether Plaintiff may receive convenient and effective relief in another forum. Litigating this action in Kansas is obviously more convenient for Plaintiff. However, while "[s]tates have an important interest in providing a forum in which their residents can seek redress for injuries caused by out-of-state actors," Plaintiff has suggested no reason that federal court in New York, for example, would be unable to adjudicate its claims with equal fairness and effectiveness, especially when the contract at issue is governed by New York law.[81] This factor "may weigh heavily in cases where a Plaintiff's chances of recovery will be greatly diminished by forcing him to litigate in another forum because of that forum's laws or because the burden may be so overwhelming as to practically foreclose pursuit of the lawsuit."[82] The facts of this case do not suggest this danger is present in this case. The contract at issue is governed by New York law, and Gnemi is an international traveler that conducts business all over the world.

The fourth factor considers the interstate judicial system's interest in obtaining the most efficient resolution of controversies. "The key points to consider when evaluating this factor are (1) the location of witnesses, (2) the location of the wrong underlying the lawsuit, (3) what forum's law applies, and (4) 'whether jurisdiction is necessary to prevent piecemeal litigation.'"[83] In this case the first two points favor Defendants because, other than Plaintiff's

---

[80]*See OMI Holdings, Inc.*, 149 F.3d at 1096 ("The state's interest is also implicated where resolution of the dispute requires a general application of the forum state's law.").

[81]*See Dudnikov*, 514 F.3d at 1081 (citing *OMI Holdings, Inc.*, 149 F.3d at 1096).

[82]*Id.* (quoting *OMI Holdings, Inc.*, 149 F.3d at 1097).

[83]*Pro Axess, Inc. v. Orlux Distr., Inc.*, 428 F.3d 1270, 1279 (10th Cir. 2005) (quoting *OMI Holdings, Inc.*, 149 F.3d at 1097).

location in Kansas, there is no suggestion that any other witnesses or the underlying wrongs occurred in Kansas.  The third point favors Defendants because New York law applies under the settlement agreement's choice of law provision.  The fourth point is neutral because neither side has suggested that any potential jurisdiction would create piecemeal litigation.

As to fifth factor—the shared interest of the several states  in furthering fundamental social policies—nothing suggests that this is relevant in the instant case and therefore the Court does not address it.  Considering all the above factors and the weak— practically non-existent—minimum contacts in this case, the Court must conclude that Defendants have established a compelling case that this Court's exercise of jurisdiction in this case would offend traditional notions of fair play and substantial justice.[84]

## V.     Venue

In this district, the standards for deciding a motion to dismiss under Rule 12(b)(3) for improper venue are generally the same as those for deciding a motion to dismiss under Rule 12(b)(2) for lack of personal jurisdiction.[85]  28 U.S.C. § 1391(b) governs venue and requires that "a substantial part of the events or omissions giving rise to the claim occurred" in this district.[86]  Because the Court finds no personal jurisdiction over Defendants, the Court likewise finds that venue is improper.

In arguing that venue is improper in this Court, Defendants argue that the case could have

---

[84]*See Vestring v. Halla*, 920 F. Supp. 2d 1189, 1197 (D. Kan. 2013) (finding that exercising personal jurisdiction would offend traditional notions of fair play and substantial justice where contacts were weak and Kansas had only a small interest in the case).

[85]*Mohr v. Margolis, Ainsworth & Kinlaw Consulting, Inc.*, 434 F. Supp. 2d 1051, 1057–58 (D. Kan. 2006).

[86]*See* 28 U.S.C. § 1391(b).

been brought in New York—"[t]herefore proper venue lies only in New York."[87]  When venue is improper, the court may, in the interests of justice, transfer the case to a district court in which it could have been brought pursuant to 28 U.S.C. § 1406(a).  Likewise, 28 U.S.C. § 1631 provides that when "a court finds that there is a want of jurisdiction, the court shall, if it is in the interest of justice, transfer such action . . . to any other such court in which the action . . . could have been brought at the time it was filed."[88]

The parties have not moved for transfer, nor have they addressed whether the interests of justice warrant transfer.  The "interests of justice" proviso in § 1406(a) is not a "talismanic incantation."[89]  If upon refiling in the new venue the action now would be barred by the statute of limitations, then it is in the interest of justice and "particularly appropriate" to transfer.[90]

Although the Court finds that Defendants' Motion to Dismiss should be granted for lack of personal jurisdiction, the Court will delay dismissal of this action to allow the parties to address whether transfer of the case would be in the interest of justice.  When considering the consequences of a transfer, the Court is authorized to take "'a peek at the merits' to avoid raising false hopes and wasting judicial resources that would result from transferring a case which is clearly doomed."[91]  To that end, the Court will address Defendants' motion to dismiss for failure

---

[87]Doc. 5 at 13; *see also* Doc. 31 at 24–25.

[88]28 U.S.C. § 1631.

[89]*Ross v. Colo. Outward Bound Sch.*, 822 F.2d 1524, 1526 n. 1 (10th Cir. 1987).

[90]*Sinclair v. Kleindienst*, 711 F.2d 291, 294 (D.C.Cir.1983) (citing *Burnett v. N.Y. Cent. R.R. Co.*, 380 U.S. 424, 430, 85 S.Ct. 1050, 1055, 13 L.Ed.2d 941 (1965) (Section 1406(a) prevents "the unfairness of barring a plaintiff's action solely because a prior timely action is dismissed for improper venue after the applicable statute of limitations has run.")); *see also McDonald v. Doolittle*, 885 F.Supp. 233, 235 (D. Kan.1995).

[91]*Hough v. Booker*, 210 F.3d 1147, 1150 (10th Cir. 2000) (citation and quotation omitted).

to state a claim.

## VI.     Failure to State a Claim

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a complaint must present factual allegations, assumed to be true, that "raise a right to relief above the speculative level" and must contain "enough facts to state a claim to relief that is plausible on its face."[92]  Under this standard, "the complaint must give the court reason to believe that *this* plaintiff has a reasonable likelihood of mustering factual support for *these* claims."[93]  The plausibility standard does not require a showing of probability that "a defendant has acted unlawfully,"[94] but requires more than "a sheer possibility."[95]

The plausibility standard enunciated in *Bell Atlantic v. Twombly*,[96] seeks a middle ground between heightened fact pleading and "allowing complaints that are no more than 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action,' which the Court stated 'will not do.'"[97] *Twombly* does not change other principles, such as that a court must accept all factual allegations as true and may not dismiss on the ground that it appears unlikely the allegations can be proven.[98]

The Supreme Court has explained the analysis as a two-step process.  For purposes of a

---

[92]*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007).

[93]*Ridge at Red Hawk, LLC v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007) (emphasis in original).

[94]*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

[95]*Id.*

[96]*Twombly*, 550 U.S. 544 (2007).

[97]*Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008) (quoting *Twombly*, 550 U.S. at 555).

[98]*Id.* (citing *Twombly*, 550 U.S. at 556).

motion to dismiss, the court "must take all the factual allegations in the complaint as true, [but] we 'are not bound to accept as true a legal conclusion couched as a factual allegation.'"[99]  Thus, the Court must first determine if the allegations are factual and entitled to an assumption of truth, or merely legal conclusions that are not entitled to an assumption of truth.[100]  Second, the Court must determine whether the factual allegations, when assumed true, "plausibly give rise to an entitlement to relief."[101]  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[102]

Defendants' Memorandum in Support of their motion to dismiss states that all Defendants seek dismissal for lack of personal jurisdiction and improper venue, and "[i]n addition, defendants Ben-Menashe and Schaap move for the dismissal of the breach of fiduciary duty claim for failure to state a claim."[103]  However, Defendants' memorandum in support also states for each Defendant that the allegations do not set out with particularity a claim of fraud, and that the allegation of a conspiracy to defraud is a thread-bare conclusion, not a well-pled fact.  Defendants Schaap and Ben-Menashe argue that the allegations in the Complaint do not show a breach of fiduciary duty.  Plaintiff's response to the motion to dismiss does not address the motion to dismiss for failure to state a claim, but rather states that it is adopting its prior

---

[99]*Iqbal*, 556 U.S. at 678.

[100]*Id.* at 679.

[101]*Id.*

[102]*Id.* at 678.

[103]Doc. 31 at 4.

briefings in response to the prior motions to dismiss.[104]  Plaintiff's prior briefings do not address

this issue other than to state that the Complaint provides that:

¶67.  At the time defendants Ben-Menashe and Schaap began conspiring together to use the Traeger corporation to defraud Proud Veterans of advance money Traeger was insolvent, because its liabilities exceeded its assets and it was unable to pay its obligations as they came due.

¶68.  At the time Ben-Menashe was a member of the board of directors of Traeger.

¶69.  At the time Proud Veterans wired and caused to be wired advance deposit money to the attorney trust account of defendant Schaap, Traeger had little or no cash at its disposal with which to pay the debts of Traeger.

¶70.  After the advance money deposits made and caused to be made by Proud Veterans to the trust account of defendant Schaap, Schaap transferred all of those trust funds to Traeger.

¶71.  Under the law of the state of New York, which governed Traeger and the obligations of Ben-Menashe as a director of Traeger, the directors of an insolvent corporation owe a fiduciary duty to the creditors of that corporation to cause the assets of the corporation to be devoted to paying the corporation's creditors prior to any other disbursements of corporation funds.

¶72.  Shortly after the April 5, 2011 contract TRL 1411 was signed Ben-Menashe and Schaap agreed that the advance money to be sought from Proud Veterans would not be used to pay the obligations of Traeger but would be transferred to other persons and entities intended to be beyond the reach of the creditors of Traeger.  In this way Ben-Menashe and Schaap conspired to cause a breach by Ben-Menashe of his fiduciary obligations to Proud Veterans and the other creditors of Traeger.

¶73.  All of the advance money deposited by Proud Veterans in the attorney trust account of Schaap was transferred by Schaap to Traeger for the purpose of violating the fiduciary duties of Ben-Menashe and for defrauding Proud Veterans.[105]

Defendants argue that the Complaint fails to allege that any money belonging to Traeger

was, in fact, used for a purpose other than paying its creditors.  However, the Complaint does

[104]Doc. 37 at 3.

[105]Doc. 1 at 26.

allege just that, and Defendants have not alleged otherwise.  Taking Plaintiff's factual allegations

in the Complaint as true, these factual allegations plausibly give rise to an entitlement to relief on

Plaintiff's breach of fiduciary duty claim.

The Court finds that Defendants' argument that Plaintiff has failed to set out its fraud

claim with particularity and that its conspiracy to defraud claim is a thread bare conclusion are

unpersuasive.  The heightened pleading requirements of Fed. R. Civ. P. 9(b) "must be read in

conjunction with the principles of Rule 8, which calls for pleadings to be 'simple, concise, and

direct.'"[106]  To survive a motion to dismiss, an allegation of fraud must "set forth the time, place

and contents of the false representation, the identity of the party making the false statements and

the consequences thereof."[107]  In other words, the plaintiff must set out the "who, what, where,

and when" of the alleged fraud.[108]  Plaintiff's Complaint satisfies these requirements.  Plaintiff

filed a thirty-one page Complaint with fourteen multi-page exhibits attached, setting forth the

details of the alleged conspiracy to defraud with detail and particularity, and setting forth the

time, place and contents of the false representations, the identity of the party making the false

statements and the consequences thereof.[109]  These facts allow the Court to draw the reasonable

inference that Defendants are liable for the alleged misconduct.  To the extent Defendants'

[106]*Schwartz v. Celestial Seasonings, Inc.*, 124 F.3d 1246, 1252 (10th Cir. 1997).

[107]*Tal v. Hogan*, 453 F.3d 1244, 1263 (10th Cir. 2006) (citation and quotation omitted).

[108]*Plastic Packaging Corp. v. Sun Chem. Corp.*, 136 F. Supp. 2d 1201, 1203 (D. Kan. 2001) (citation omitted).

[109]See Fed. R. Civ. P. 9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."); *see also United States ex rel. Sikkenga v. Regence Bluecross Blueshield of Utah*, 472 F.3d 702, 726–27 (10th Cir.2006) (stating that Rule 9(b) requires a plaintiff to "set forth the time, place, and contents of the false representation, the identity of the party making the false statements and the consequences thereof" (internal quotation marks omitted)).

motion to dismiss suggests that Plaintiff's conspiracy to defraud claim should be dismissed for failure to state a claim, the Court denies the motion to dismiss as to that claim.

**IT IS THEREFORE ORDERED BY THE COURT** that Defendants' Motion to Dismiss (Doc. 30) for lack of personal jurisdiction shall be **GRANTED**.  However, dismissal of this action shall be held in abeyance pending further order of the Court.

**IT IS FURTHER ORDERED BY THE COURT** that the parties shall file any motions to transfer and/or briefs regarding whether transfer of this case would be in the interest of justice under 28 U.S.C. §§ 1406 or 1631 within fourteen (14) days of this order, and any responses shall be filed within seven (7) days thereafter.  Plaintiff's motions and memoranda in support and/or briefs shall be no longer than seven pages.  Defendants' collective motions and memoranda in support and/or briefs shall be no longer than seven pages.  Replies will not be allowed.

**IT IS SO ORDERED.**

Dated: February 26, 2014

 S/ Julie A. Robinson
JULIE A. ROBINSON
UNITED STATES DISTRICT JUDGE